Elliot Gale (Bar #1119904)
egale@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiffs
Phillip and Lynn Petrie

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Phillip and Lynn Petrie<br><br>    Plaintiffs,<br><br> v.<br><br>Equifax Information Services, LLC,<br>TransUnion, LLC; Americollect, Inc.;<br>Maurices Incorporated<br><br>    Defendants. | CASE NO. 2:21-cv-01060<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiffs Phillip and Lynn Petrie, individuals, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and15 U.S.C. §1681i(a)(5)(A)).

2. Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiffs' discharged accounts.

3. Defendant Americollect, Inc. (hereinafter "AI") is reporting Plaintiffs' account as unpaid collection accounts with balances and past-due balances owed rather than listing the accounts as included/discharged in bankruptcy.
4. Similarly, Defendant Maurices Incorporated (hereinafter "Maurices") is reporting that the account is charged-off rather than included and discharged in bankruptcy.
5. Such reporting is wholly inaccurate, misleading, and adversely impacts Plaintiffs' credit worthiness.
6. Plaintiffs' credit scores have been adversely impacted by the reporting.
7. Plaintiffs' credit reports have been disseminated to third parties since the completion of their chapter 13 bankruptcy and Plaintiffs have been unable to obtain favorable interest rates as a result of the reporting by AI and Maurices.
8. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

## JURISDICTION & VENUE

9. Plaintiffs re-allege and incorporate herein by this reference the allegations in each and every paragraph above, fully set forth herein.
10. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681
11. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

12. Plaintiffs allege that each and every defendant data furnisher was included in Plaintiffs' Chapter 13 bankruptcy filing or had notice of Plaintiff's bankruptcy filing and reaffirmation of certain debts.
13. Plaintiffs allege that AI and Maurices received notice of Plaintiffs' chapter 13 filing or had reason to know of Plaintiffs' bankruptcy filing and entry of their chapter 13 discharge.

14. Plaintiffs allege that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
15. Plaintiffs allege that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.
16. Plaintiffs allege that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiffs' ability to reorganize and repair their FICO Score.
17. In the alternative Plaintiffs allege that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

18. FICO is a leading analytics software company. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.
19. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.
20. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.
21. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.
22. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

23. There are 28 FICO Scores that are commonly used by lenders.
24. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).
25. The three largest CRAs are Experian Information Solutions, Inc., Equifax, Inc., and Transunion, LLC.
26. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
27. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.
28. Each of the five factors is weighted differently by FICO.
29. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
30. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
31. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
32. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
33. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

34. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and for both, FICO uses the filing date to determine how long ago the bankruptcy took place.

**e-OSCAR**

35. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
36. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
37. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).
38. regarding a consumer's credit worthiness.

**Metro 2**

39. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.
41. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
42. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

5

43. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
44. The CDIA's Metro 2 is accepted by all CRAs.
45. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
46. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
47. The three main credit bureaus helped draft the CRRG.
48. The CRRG is not readily available to the public. It can be purchased online for $229.45.
49. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
50. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

51. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

53. All three major CRAs are members of the CDIA

### Consumer Information Indicator

54. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.

55. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

56. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

57. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

58. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

59. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

60. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

61. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

62. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

63. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

64. A failure to property update the CII Metro 2 field can result in a consumer having a lower credit score and make the consumer appear much less credit worthy.

//

**Plaintiffs Bankruptcy Filing**

65. Plaintiffs filed for Chapter 13 bankruptcy protection on December 30, 2015 in order to discharge various debts and improve Plaintiffs' credit worthiness and FICO Score.
66. Plaintiffs received their Chapter 13 discharge on May 18, 2020.
67. On July 7, 2020 Plaintiffs ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiffs' creditors after completion of their bankruptcy.
68. Plaintiffs noticed several different trade lines on the July 7, 2020 credit report all reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.
69. AI reported various accounts in Plaintiff Phillip Petrie's name that were past-due and in collections.
70. Similarly, Maurices was reporting Plaintiff Lynn Petrie's account as charged-off rather than included/discharged in bankruptcy.
71. In response, Plaintiffs disputed the inaccurate AI and Maurices tradelines via certified mail with Experian, Equifax, and TransUnion.
72. The accounts were disputed on August 11, 2020.
73. Plaintiffs' dispute letters specifically put defendant AI and Maurices on notice that the accounts were included and discharged in Plaintiffs' chapter 13 bankruptcy and the tradelines needed to be updated to reflect the filing and discharge.
74. Plaintiffs are informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.
75. Plaintiffs ordered a second credit report from Experian, TransUnion Equifax for the sole purpose to ensure the AI and Maurices accounts had in fact been updated.
76. The AI and Maurices accounts listed above had not been updated and was still appearing on Plaintiffs' credit reports.

**Inaccuracy – AI**

77. Plaintiffs were frustrated to see that Defendant AI did not properly update the account but instead continued to report Plaintiffs' account as past-due with balances owed and outstanding.

78. AI's failure to report the discharge makes it appear that the accounts were not subject to Plaintiffs' chapter 13 bankruptcy/discharge and are still outstanding.

79. Therefore, it appears that Plaintiffs must still pay on the AI accounts despite receiving a chapter 13 discharge.

80. AI's reporting makes it seem as if the debt is still outstanding and that Plaintiffs are still responsible for the amounts listed on the credit reports.

81. AI's reporting is incomplete and inaccurate.

82. AI should have updated the CII to "H" to reflect the bankruptcy discharge.

**Willfulness**

83. This was not a negligent act by AI but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore their credit.

84. AI's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account implies it was not included/discharged in bankruptcy.

85. AI knows that its reporting must be accurate and complete.

86. AI is not following industry standards and is instead reporting incorrect information with the hope that Plaintiffs will make a payment on the account.

87. After receiving Plaintiffs' dispute AI, rather than update the tradeline, ignored the dispute and continued to report the accounts as past-due.

88. AI's reporting of the inaccurate and misleading information was done intentionally in order to have Plaintiffs make a payment on the accounts in order to remove the derogatory information from their credit reports.

**Inaccuracy – Maurices**

89. Plaintiffs were also frustrated to see that Defendant Maurices did not properly update the account.

90. Maurices was still reporting the account as charged-off without any notation that the account was included/discharged in Plaintiffs' chapter 13 bankruptcy filing.

91. Maurices' failure to update the account makes it appear as though the Maurices account was not part of Plaintiffs' chapter 13 bankruptcy filing nor subject to the chapter 13 discharge.

92. There is no information regarding the Maurices account that would inform potential lenders or anyone else viewing the credit report that the account has been included/discharged in bankruptcy.

93. Maurices' reporting makes it seem as if the debt is still outstanding and that Plaintiffs are liable to make payments on the account, despite Plaintiffs filing for bankruptcy protection and receiving a bankruptcy discharge.

94. Maurices' reporting is entirely incomplete, misleading and technically inaccurate.

95. The reporting is incomplete because the report lacks any updates on the account.

96. Maurices should have updated the CII to report a "H" as instructed by the CRRG after Plaintiffs received their chapter 13 discharge.

97. As it stands it appears that Maurices continues to report the account as charged-off, making it appear that Plaintiff still owes a balance on the account and that the account is not included in Plaintiff's chapter 13 bankruptcy.

98. Such reporting remains wholly incomplete and would lead lenders to question whether or not Plaintiff has made mortgage payments consistently. Thus, such reporting makes Plaintiff appear less credit worthy.

**Willfulness**

99. This was not a negligent act by Defendant Maurices but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore their credit.

100. Maurices' reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs did not include the debt owed to Maurices in their bankruptcy.

101. Maurices knows that its reporting must be accurate and complete.

102. Maurices is not following industry standards and is instead reporting incorrect information with the hope that Plaintiffs will make a payment on the account.

103. Once Maurices received Plaintiffs' dispute, rather than update the tradeline, Maurices instead ignored the dispute and continued to report the inaccurate information.
104. Plaintiffs believe the reporting of the inaccurate and misleading information was done by Maurices in order to have them make a payment on the account in order to have the negative information removed from their credit report.
105. Such a scheme directly undermines the integrity of not only the bankruptcy court but also the integrity of the credit reporting system at large.

**Damages**

106. As a result of the incorrect reporting, Plaintiffs have suffered economic loss, diminished credit, emotional harm, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code.
107. Plaintiffs are frustrated and annoyed that their credit has not improved since the discharge of their chapter 13 bankruptcy as they believed the accounts with AI and Maurices were discharged.
108. Plaintiffs' have experienced an increase in their anxiety and stress once they learned that AI and Maurices were not acknowledging the bankruptcy discharge.
109. Plaintiffs' credit score has remained at a low level as a result of the AI and Maurices reporting, preventing them from rebuilding their credit and impacting their ability to obtain a more favorable interest rate on extensions of credit.
110. The actions of Equifax, TransUnion, Maurices, and AI as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

<u>**FIRST CAUSE OF ACTION**</u>
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants)

**Equifax and TransUnion – Failure to Assure Credit Reporting Accuracy.**

111. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

11

Case 2:21-cv-01060-SCD    Filed 09/13/21    Page 11 of 17    Document 1

112. Equifax and TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' credit reports and credit files it published and maintained concerning Plaintiffs.

113. Had Equifax and TransUnion maintained reasonable procedures to assure maximum accuracy Equifax and TransUnion would never have allowed Defendants AI and Maurices to report the account as described herein.

114. As a result of Equifax and TransUnion's violation of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

115. The violations described herein by Equifax and TransUnion was willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

116. Equifax and TransUnion intentionally send consumer disputes to employees who do not live within the continental United States.

117. This is done intentionally to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

118. These employees for Defendants Equifax and TransUnion receive little to know training concerning how to accurately report consumer debt.

119. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)

120. Equifax and TransUnion employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

121. Equifax and TransUnion have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

122. Equifax and TransUnion knew Plaintiffs received a discharge as the discharge was reported in the public records portion of both the Equifax and TransUnion credit reports.

123. Given that Equifax and TransUnion helped draft the CRRG, and Plaintiffs specifically referenced industry guidelines in the dispute letter Equifax and TransUnion knew that the AI and Maurices accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.

124. Consequently, Defendants Equifax and TransUnion are liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and TransUnion were at least negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

125. Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Experian, Equifax, and TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants)

**AI and Maurices – Failure to Reinvestigate.**

126. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

127. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

128. Defendants AI and Maurices violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

129. The CRAs provided notice to AI that Plaintiffs were disputing the inaccurate and misleading information, but AI failed to conduct a reasonable investigation of the information.

130. Based on Plaintiffs' disputes, AI and Maurices should have known its accounts were included and discharged in Plaintiffs' chapter 13 bankruptcy.

131. The most basic investigation would include a simple review of well-established credit reporting industry standards.

132. Plaintiffs allege AI and Maurices did not review well established industry standards for credit reporting.
133. If AI and Maurices had reviewed such standards AI and Maurices would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.
134. Such an investigation would be unreasonable.

**Equifax and TransUnion – Failure to Reinvestigate Disputed Information.**

135. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.
136. After Plaintiffs disputed the account mentioned above, Ex Equifax and TransUnion were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.
137. Equifax and TransUnion failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.
138. Plaintiffs allege that Equifax and TransUnion have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.
139. Equifax and TransUnion are not passive entities bound to report whatever information a data furnisher, such as AI and Maurices, provide.
140. Plaintiffs allege that Equifax and TransUnion are readily familiar with Metro 2 guidelines and credit reporting industry standards given that Equifax and TransUnion helped draft said guidelines.
141. Given the aforementioned, Plaintiff alleges that Equifax and TransUnion can and do suppress inaccurate information from being reported when DFs provide inaccurate information.
142. Equifax and TransUnion can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.
143. Equifax and TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

144. Equifax and TransUnion therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered and the error corrected.
145. Equifax and TransUnion intentionally, willfully or with reckless disregard for Plaintiffs' accuracy did no investigation whatsoever given that Equifax and TransUnion's general policy are to simply parrot whatever information a data-furnishers sends.
146. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

**THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants)

**Equifax and TransUnion – Failure to Review and Consider All Relevant Information.**

147. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.
148. Equifax and TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiffs.
149. As a result of Equifax and TransUnion's violation of 15 U.S.C. § 1681i(a)(4), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.
150. The violations by Equifax and TransUnion were willful, rendering Equifax and TransUnion individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.
151. In the alternative, Equifax and TransUnion were negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.
152. Plaintiffs is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax and TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants)

**Equifax and TransUnion – Failure to Delete Disputed and Inaccurate Information.**

153. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

154. Equifax and TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' credit file or modify the item of information upon a lawful reinvestigation.

155. As a result Equifax and TransUnion's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

156. The violations by Equifax and TransUnion were willful, rendering Equifax and TransUnion individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

157. In the alternative, Equifax and TransUnion were negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

158. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax and TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

159. Wherefore, Plaintiffs pray for judgment as hereinafter set forth.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues of fact triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n,

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n,

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. §

1681n & o,

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Dated: September 13, 2021

**Gale, Angelo, Johnson, & Pruett, P.C.**
*/s/ Elliot Gale*
Elliot Gale
Attorney for Plaintiffs